UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                          CRIMINAL NO.  12-26 (JRT/JSM)

       Plaintiff,

v.                                                 <u>REPORT AND RECOMMENDATION</u>

WAKINYON WAKAN MCARTHUR (1),
SHAUN MICHAEL MARTINEZ (2),
CHRISTOPHER LEE WUORI (3),
ANTHONY FRANCIS CREE (4), and
WILLIAM EARL MORRIS (6)

       Defendants.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon Wakinyon Wakan McArthur's Motion to Suppress Statements [Docket No. 473]; Wakinyon Wakan McArthur's Motion to Suppress Evidence Obtained As a Result of Search and Seizure [Docket No. 478]; Shaun Michael Martinez's Motion for Suppression of Identification Evidence [Docket No. 335]; Shaun Michael Martinez's Motion to Suppress Statements [Docket No. 336]; Shaun Michael Martinez's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 337]; Shaun Michael Martinez's Motion for Suppression of Evidence Obtained by Search and Seizure [Docket No. 338]; Christopher Lee Wuori's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 513]; Christopher Lee Wuori's Motion to Suppress Statements [Docket No. 514]; Christopher Lee Wuori's Motion to Suppress Evidence Obtained by Search and Seizure [Docket No. 516]; Anthony Francis

Cree's Motion to Suppress all Electronic Surveillance Evidence and any Evidence Derived Therefrom [Docket No. 413]; Anthony Francis Cree's Motion to Suppress any Evidence Obtained as a Result of any Illegal Identification Procedures [Docket No. 415]; Anthony Francis Cree's Motion to Suppress any Evidence Obtained a Result of any Illegal Interrogations [Docket No. 416]; Anthony Francis Cree's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches or Seizures [Docket No. 417]; William Earl Morris' Motion to Suppress Any Statements Made by Defendant [Docket No. 455]; William Earl Morris' Motion to Suppress Evidence Obtained as a Result of Any Illegal Searches [Docket No. 456]; William Earl Morris' Motion to Suppress Identifications of Defendant [Docket No. 457]; and William Earl Morris' Motion to Suppress Wire Interceptions, Electronic Surveillance, and Wiretapping [Docket No. 459].

Steve Schleicher and Andrew Winter, Assistant United States Attorneys, appeared on behalf of the United States; Frederick Goetz, Esq. appeared on behalf of defendant (1) Wakinyon McArthur; Andrew Birrell, Esq. appeared on behalf of defendant (2) Shaun Martinez; Jennifer Speas, Esq. appeared on behalf of defendant (3) Christopher Wuori; John Brink, Esq. appeared on behalf of defendant (4) Anthony Cree; and Thomas Shiah, Esq. appeared on behalf of defendant (6) William Morris.  All of these defendants were present at the hearing.

The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

## I.   WAKINYON WAKAN MCARTHUR'S MOTION TO SUPPRESS EVIDENCE SEIZED AT THE CASS LAKE RESIDENCES

Defendant Wakinyon Wakan McArthur sought to suppress evidence from two search warrants for two residences located in Cass Lake, Minnesota.   The first residence was located at XXXX Maple Street in Cass Lake, Minnesota ("Maple Street residence"); the second was located at XXXX Grant Utley Avenue in Cass Lake, Minnesota ("Grant Utley Avenue residence").   See Gov't Exs. 11, 12.   McArthur submitted this motion on the four corners of the warrants and applications.   McArthur argued that the affidavits in support of the search warrant for both the Maple Street residence and Grant Utley residence failed to establish the requisite nexus between the items to be seized and the place to be searched, and that as to the Maple Street residence, the information in the supporting affidavit was largely stale, given that it had been gathered months before the search warrant was obtained.   See Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 478], pp. 3-4.

In response, the Government maintained that both search warrants were supported by probable cause, and that in any event, even if they did lack probable cause, they should be upheld pursuant to the good-faith exception articulated in United States v. Leon, 486 U.S. 897 (1984) because the agents had no reason to doubt their authenticity or validity in light of their issuance by Federal Magistrate Judges. Government's Response to Defendants' Pretrial Motions ("Gov't Resp.") [Docket No. 620], pp. 24-25.

A.    **Standard of Review**

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit.  Illinois v. Gates, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit. . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462 U.S. at 238.  In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed.  Id. at 238-39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge.").  As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'"  United States v. Solomon, 432 F.3d 824, 827 (8th

4

Cir. 2005) (citing United States v Etheridge, 165 F.3d 655, 656 (8th Cir. 1999), quoting United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995)).

**B.   Maple Street Search Warrant**

ATF Special Agent Russell Traurig applied for a search warrant on February 17, 2011 to search the Maple Street residence, which was believed to be one of several residences used by defendants McArthur and Christopher Wuori. See Gov't Ex. 12.[1] The warrant sought documentary evidence of criminal activity, including records associated with drug trafficking and related proceeds and gang activity. Id., p. 00000020. The warrant signed by United States Magistrate Judge Karen Kline and executed on February 17, 2011, was a documents and records warrant. It authorized the search for documents and records relating to the Native Mob gang and the purchase and distribution of narcotics; documents related to travel; financial records; currency; photographs and photograph albums relating to the Native Mob gang and its members or narcotics; documents reflecting the addresses or telephone numbers of coconspirators, other gang member or customers; documents showing occupancy of the residence; and newspaper clippings or letters relating to any crime. Id., pp. 00000034, 40.

The affidavit in support of the search warrant provided the following supporting information: As background, Special Agent Trauig explained that he had been investigating the Native Mob's criminal activities for the past 4 years. Id., p. 00000023.

---

[1]     The page numbers cited within Exhibit 12 refer to the Bates number assigned to the cited page.

The Native Mob has been the largest Native American gang in Minnesota since the mid-1990's, committing a variety of crimes including drug trafficking, drive-by shootings, assaults and robberies.  Id.  The Native Mob incorporates the Native American culture into their recruitment methods and uses religious symbols as gang identifiers both in and outside of prison.  Id., pp. 00000023-24.

The structure and organization of the Native Mob includes a "Chief", a "Co-Chief", a "War Chief," a "Sergeant at Arms," and a "Treasurer."   Id., p. 00000024.   The Native Mob is organized by geographical regions and a representative is in charge of each region.  Id.

McArthur was the current Chief of the Native Mob and his associate, and Native Mob Treasurer, was Wuori.   Id.   The Native Mob holds council meetings of representatives from different geographical regions in Minnesota and these meetings are directed and controlled by McArthur, or in his absence, by the Co-Chief, identified as defendant Shaun Martinez.  Id.   The purpose of these meetings was to discuss and direct illegal activities of Native Mob members, including drug trafficking and violence toward rivals.  Id.

In his training and experience, Special Agent Traurig attested that it is common for drug traffickers to maintain and retain financial records relating to the trafficking of narcotics, large amounts of cash, telephone numbers and addresses of criminal associates, photographs of themselves and their associates, and firearms.   Id., pp. 00000024-26.  He further attested that these items are not the type that are disposed of after commission of a crime, and often gang members kept such documents and items

in their residences. Id.. In the course of the present investigation, Special Agent Traurig reported that in the past Native Mob documents had been recovered, including Native Mob by-laws, and that it would be likely that McArthur or Wuori would have in their possession such documents given their positions within the Native Mob. Id., p. 00000025.

Officers concluded that McArthur resided at the Maple Street residence and Wuori had been the original tenant and an on-again and off-again resident. Id., p. 00000026. This conclusion was based on observations of both McArthur and Wuori by officers at the residence on more than five occasions in the past year, observations of vehicles occupied by McArthur and Wuori over 25 times at the residence, and information from two cooperating individuals who told officers that they had been at the residence when McArthur and Wuori were also at the residence. Id. Id. In addition, in the spring of 2010, a special agent went out to the Maple Street residence and made contact with McArthur and Wuori. Id. Based on McArthur's appearance and the time of day, it was believed that McArthur was staying overnight at the residence. Id. On January 7, 2011, McArthur was involved in an accident and gave an address in Bemidji, Minnesota as his residence. Id. However, shortly after the accident, the officer observed McArthur's vehicle at the Maple Street address, and he had not been observed at the Bemidji residence for over year. Id. On January 13, 2011, McArthur filed a Leech Lake Police form indicating that he lived at the Maple Street residence. Id. On February 17, 2011, a Leech Lake Police Officer made personnel contact at the Maple Street residence with McArthur, who stated that he resided at the address. Id.

Officers knew of no other resident of the home other than the associates of McArthur and Wuori. Id.

Special Agent Traurig stated that law enforcement had used numerous confidential reliable informants and cooperating witnesses and defendants to gain information regarding the Native Mob's activities, including CRI#1, CRI#2 and CD#3 described in the affidavit. Id., pp. 00000026-27. CRI#1 had been a Native Mob member for ten years, and had provided information regarding Native Mob activities that had been independently corroborated; CRI#2 had been a Native Mob member for approximately four years, had attended numerous Native Mob meetings, committed crimes for the Native Mob ,and had provided information regarding Native Mob activities that had been independently corroborated; and CD#3 had been a member of the Native Mob for over 20 years, had attended approximately 10 Native Mob meetings and his description of Native Mob council meetings have been consistent with the descriptions by CRI#1 and CRI#2 and law enforcement recordings of Native Mob council meetings. Id., p. 00000027.

CRI#1 and CRI#2, along with CD#3, all identified Wuori as the primary source of cocaine and crack cocaine for Native Mob members and that Wuori worked directly for McArthur. Id., p. 00000027. CRI#1, told investigators that in 2010 he had witnessed Wuori meet with a drug source in Minneapolis and purchase 15-20 ounces of powdered cocaine, return to the Maple Street residence, cook a portion of the cocaine in the microwave oven and store a portion of the crack at the residence. Id. CR#1 also said that on other occasions he had seen Wuori store crack cocaine at the residence. Id.

8

CRI#2 told investigators that he received his narcotics from Martinez, currently a co-chief or second in command of the Native Mob, who received them from Wuori.  Id.

CD#3 told investigators that he attended a Native Mob meeting in 2009 at the Maple Street residence where he was appointed "War-Chief" of the Native Mob by McArthur.  Id., p. 00000028.  In addition, he stated that he had been at the Maple Street residence on five to six occasions in 2010, and that on one occasion in 2010, he had witnessed Wuori package 46 eight-inch balls of crack cocaine at the residence, some of which were stored at the residence.  Id.  Further, CD#3 indicated that firearms were stored in a hole in the wall at the residence, and that he was expected to know where firearms were stored as that is one of the responsibilities of a representative.  Id.  CD#3 also detailed several occasions in 2010 when he brought others to the Maple Street residence to purchase crack cocaine from Wuori.  On one occasion, CD#3 indicated that MacArthur provided crack cocaine that he retrieved from a bag inside the Maple Street residence.  Id.

Based on all of this information, Special Agent Traurig believed law enforcement would find documentary evidence of criminal activity, including records associated with drug trafficking and related proceeds and gang activity.  Id.

## C.     Grant Utley Avenue Search Warrant

DEA Special Agent Travis Ocken applied for a search warrant on January 20, 2012 to search the Grant Utley Avenue residence.  Gov't Ex. 11.  The warrant was signed by United States Magistrate Judge Arthur J. Boylan, and executed on January 24, 2012.  Id., p. 0000007.  Like the Maple Street warrant, this warrant sought

documentary evidence of criminal activity at several residences (which included the Grant Utley Avenue residence), including records associated racketeering activities of the Native Mob,. Id., p. 00000015, ¶15.

The Grant Utley Avenue search warrant authorized the search for documents, records and items relating to the Native Mob gang, including but not limited to documents evidencing gang indicia, membership lists, nickname lists, phone numbers, gang law, lists of firearms in the gang's possession, gang-related graffiti and lists of money in the gang's possession; property indicating membership in the Native Mob, including clothing with gang colors or other symbols; photographs and other media containing the images of co-conspirators and gang members (with or without assets or contraband); items showing occupancy of the residence; and pagers, cellular telephones, answering machines, computer hard drives, and other electronic media that could contain any of the above-mentioned items. Id., p. 0000009.

The affidavit, which sought to establish probable cause that documents and items relating to gang activity would be discovered at the Grant Utley Avenue residence, provided the following supporting information:  On January 19, 2012, a federal grand jury returned a 47-count indictment against numerous defendants, including McArthur, for engaging in a federal racketeering conspiracy in violation of 18 U.S.C. § 1962(d) ("RICO"). Id., ¶ 5.  The Native Mob is operated and supervised by an overall leader, known as "Chief," who is responsible for setting gang policies of the Native Mob, approving all significant actions of the organization, resolving disputes within the organization and resolving disputes with other criminal organizations.   Id., ¶ 5(c).

McArthur, while serving a sentence for murder, came up with the concept of a disciplined and organized Native Mob, and once he was released in 2007, he asserted control over the gang, has been the head of the Native Mob and overseeing the activities of the Native Mob since this time. Id., ¶¶ 18, 35.

Based on evidence from cooperating gang members and several recorded meetings between cooperating witnesses and Native Mob members, the following information was obtained and described in the affidavit: the Native Mob operated their affairs through laws and policies, some which were codified in a series of bylaws; the members of the Native Mob attended regular meetings known as councils; the Native Mob employed and used gang-related terminology, symbols, gestures and color schemes; the Native Mob engaged in a system of "violations" involving attempted murder, conspiracy to murder, and assaulting or threatening others who violated the Native Mob's rules or posed an outside threat to the organization; the organization managed the firearms of the membership; and the Native Mob financed its activities through funds collected by acts of robbery, extortion and the trafficking of narcotics. Id., ¶¶ 7(a)-(h).

Based on his training and experience in firearms and gang related investigations, Agent Ocken stated that gang members often keep name and phone lists of others in their organization, which could include their real names or aliases of other gang members as well as their positions within the organization; keep ledgers that contain membership lists, gang hierarchy, gang member attendance at meetings, money paid and owed to gang members during the sale of narcotics, lists of the types of firearms

currently possessed by the gang as a whole, and the total money available to the gang to purchase illegal contraband; photograph themselves together during gatherings and trips to show associations with each other, as well as places of important significance; and use cellular telephones to communicate, store names and telephone numbers of and photographs with other gang members.  In addition, gang members often communicate with each other using computers and electronic emails.  Id., ¶¶ 11(a)-(d), 13.  Additionally, gang members commonly keep all these documents and items in their residence, and keep them for significant periods of time "because the gang is an ongoing enterprise and membership in the gang is for life … [, and] as source of pride reflecting their membership in the gang."  Id., ¶¶ 11(e), 16.  In this regard, during the course of the investigation, law enforcement had recovered membership rosters, gang bylaws, photographs of various Native Mob members posing with each other and flashing gang related signs, gang related graffiti and other gang related materials from various Native Mob gang members' residencies.  Id., ¶ 12.  Specifically as to McArthur, a February 18, 2011 search of his Maple Street residence yielded evidence of clothing and ball caps displaying logos utilized by known Native Mob members, documents with the names of other known Native Mob members, a single .22 caliber bullet and a small quantity of marijuana.  Id., ¶¶ 32, 33.

Agent Ocken set forth the background of three cooperating defendants that were used by law enforcement in their investigation, CRI#1, CRI#2 and CD#3, to establish the nature of criminal activity associated with McArthur.  Id., ¶¶ 20-23.  CRI#1 had been a Native Mob member for eleven years, had provided information regarding Native Mob

12

activities that had been independently corroborated, and had recorded a Native Mob council meeting at the direction and control of law enforcement; CRI#2 had been a Native Mob member for approximately three years, had attended numerous Native Mob meetings, committed crimes for the Native Mob, and had had provided information regarding Native Mob activities that had been independently corroborated; and CD#3 had been a member of the Native Mob for over 4 years, had provided information regarding Native Mob activities that had been independently corroborated, recorded a Native Mob council meeting at the direction and control of law enforcement, and had conducted controlled purchases of controlled substances from Native Mob members at the direction and control of law enforcement.  Id., ¶¶ 20-22.

Agent Ocken then provided the following information as it related to McArthur and his alleged criminal activities.  In July 2010, CD#3, under the direction of law enforcement, recorded a Native Mob council meeting in which 20 members were in attendance.  Id., ¶ 24.  McArthur led the council meeting.  Id.  During the meeting, the members discussed the structure and leadership of the gang, the need for firearms to be transported to certain areas to be used in planned violence, the commission of violence against rival gangs, internal issues within the gang and how the members should be punished, who was snitching on Native Mob members and how those members should be dealt with, the need to send money to members inside prison who committed crimes in furtherance of the gangs, and gang recruitment.  Id.  During the recorded meeting, McArthur also discussed dropping off guns to members and complaining that the gang's firearms were disappearing.  Id., ¶ 35(d), (e).

On May 16, 2011, CD#3, under the direction of law enforcement, contacted McArthur for the purpose of purchasing crack cocaine. Id., ¶ 29. Officers observed CD#3 meet with McArthur. Id. CD#3 told McArthur that he wanted to buy a ball of crack cocaine. Id. McArthur instructed CD#3 to give him $20 and told CD#3 that he would deliver the crack cocaine to CD#3's residence later that day. Id. Later in the afternoon, CD#3, at the direction of law enforcement, contacted McArthur who instructed him to return to Tract 33. Id. Officers equipped CD#3 with a recording device. Id. Officers followed him to a duplex in Tract 33 and upon arrival, McArthur told him to speak to Wuori inside the residence who then introduced him to a third individual who provided CD#3 with crack cocaine. Id. Wuori told the cooperating defendant that the crack cocaine would become cheaper if he bought more from him. Id.

In support of his belief that McArthur was residing at the Grant Utley Avenue residence, Agent Ocken stated that on December 23, 2011, in an attempt to locate McArthur and knowing based on past police contacts that he lived in Cass Lake area, officers observed a vehicle registered to McArthur's girlfriend (who was residing with McArthur during the execution of the February 18, 2011 search warrant at the Maple Street residence) parked in the alley behind the Grant Utley Avenue residence. Id., ¶ 36(a). On January 10, 2012, officers conducted surveillance of the Grant Utley Avenue residence and observed McArthur at 9:35 a.m. exit the residence wearing a green coat, blue boxer shorts, white socks and what appeared to be house slippers. Id., ¶ 36(b). Based on his appearance, officers believed that McArthur had just gotten up. Id.

Officers then observed him walk to a vehicle parked in the back of the alley then re-enter the house through a back door.  Id.

### D.  **Analysis**

This Court finds that both warrant applications contain sufficient information from which a reasonable person could conclude that there was evidence of a crime located at the Maple Street and Grant Utley Avenue residences.

The Maple Street Affidavit set out that McArthur was the current Chief of the Native Mob and the Native Mob treasurer was Wuori, and that McArthur used council meetings to orchestrate the illegal activities of the Native Mob, including narcotics activity and violence in dealing with rivals.  The Affidavit further set out that based on Agent Trauig's training and experience, it was common for drug traffickers to maintain the type of documents and items sought by the warrant at their homes and to retain them and not dispose of them following the commission of a crime.  In addition, two confidential reliable informants and a cooperating co-defendant all identified Wuori as the primary source of cocaine and crack cocaine for Native Mob members and that crack cocaine was made, stored and sold by Wuori and McArthur on several occasions throughout 2010 at the Maple Street residence.  The residence had also been host to a Native Mob meeting in 2009.  Lastly, based on surveillance and McArthur's own statements, officers had information that McArthur was residing at the Maple Street residence as late as February 18, 2011.  In sum, there was sufficient evidence presented to the Magistrate Judge to connect Wuori and McArthur to criminal activity

and to the Maple Street residence and to support a finding that documentary evidence of criminal activity would be found at this location.

Likewise, as to the Grant Utley Avenue residence, the supporting affidavit provided evidence that McArthur had been leading the Native Mob gang and overseeing its activities since 2007; McArthur led a July 2010 a Native Mob council meeting dealing with gang business; and McArthur conducted a drug transaction in May 2011, which was recorded by law enforcement.   In addition, based on Agent Ocken's training and experience in firearms and gang-related investigations, the affidavit established that the types of documents and items sought by the warrant are maintained by individuals engaged in gang-related activities in their residences, and are retained for significant periods of time, as further evidenced by the documents and materials seized in in the search of McArthur's Maple Street residence on February 18, 2011.   Finally, police surveillance connected MacArthur to the residence as of January 2012.   As such, the Court finds that there was sufficient evidence to connect McArthur to criminal activity, McArthur to the Grant Utley Street residence, and that evidence of criminal activity related to the Native Mob gang would be found at this property.

McArthur made a conclusory assertion in his motion that the supporting affidavit to the Maple Street warrant was largely stale, because the evidence been gathered months before the search warrant was obtained.   This contention is rejected.

"Probable cause must exist when a warrant is issued, not merely at some earlier time."   LaMorie, 100 F. 3d at 544 (citations omitted).   "There is no bright-line test for determining when information is stale. Whether the averments in an affidavit are

sufficiently timely to establish probable cause depends on the particular circumstances of the case, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993) (citing United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1984)). Thus, "the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999) (citations omitted); see also United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir.), cert. denied, 516 U.S. 871 (1995) ("The passage of time is less significant when there is cause to suspect continuing criminal activity.") (citations omitted). Further, "where recent information corroborates otherwise stale information, probable cause may be found." Id. at 1446 (quotation and citation omitted); see generally, United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information on marijuana growing operation found not stale because "[w]hen the evidence sought is of an ongoing criminal enterprise, such as marijuana growing, rather than that of a completed act, greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time").

In this case, the evidence presented in the search warrant applications was that the criminal activity was continuing in nature and that MacArthur had been the leader of the Native Mob since 2007 through the present. Consequently, given that the Native Mob had been in existence for a lengthy period of time, with McArthur as its leader, and was involved with ongoing narcotics trafficking, it was just as likely that evidence related

17

to gang activities and affiliation would still be present wherever McArthur resided. Moreover, Agent Trauig's affidavit established that it was common for drug traffickers to maintain the type of documents and items sought by the warrant at their homes and to retain them and not dispose of them following the commission of a crime. See United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999) (citing United States v. Humphrey, 140 F.3d 762, 764 (8th Cir. 1998)) ("The evidence sought under the search warrant in this case--primarily books and records relating to drug trafficking, as well as names, addresses, and photographs of co-conspirators--is of a type that might have remained on the premises for some time after McNeil's drug courier activities were complete."). This is powerful evidence that despite the age of some of the evidence presented in support of probable cause that documents and materials bearing on criminal activity of McArthur and the Native Mob would be found at his home.

Finally, this Court finds that even if there had been a constitutional violation, the Leon good faith exception applies. See United States v. Leon, 468 U.S. 897 (1984). The Leon exception recognizes that "[w]hen a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search." United States v. Martin, 833 F.2d 752, 755 (8th Cir. 1987) (citing Leon, 468 U.S. at 923). "Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth . . . where the issuing magistrate wholly abandoned his [or her] judicial role . . . [where the affidavit in support of the warrant] is

'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable' . . . [or where] the warrant is so facially deficient--i.e. in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid. Leon, 468 U.S. at 923 (internal quotations and citations omitted); see also United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001) (discussing the four circumstances in which the Leon good faith exception does not apply); United States v. Simpkins, 914 F.2d 1054, 1057 (8th Cir. 1990) (same). There is no evidence that any of the four circumstances precluding the application of the Leon good faith exception are present in this case. Therefore, even if the Maple Street and Grant Utley Avenue warrants were technically defective, which they are not, the officers' reliance on the warrants was objectively reasonable in light of the totality of the circumstances.

In conclusion, this Court finds that both the Maple Street and Grant Utley Avenue warrants were supported by probable cause, and even if they were not, the Leon good faith exception applies. McArthur's motion to suppress the evidence seized from these two residences should be denied.

## II. WAKINYON WAKAN MCARTHUR'S MOTION TO SUPPRESS STATEMENTS

### A. Factual Background

Investigator Jerome Wilhelmy with the Minnesota Department of Corrections ("MDOC"), testified that on February 18, 2011, he participated in the early morning execution of a search warrant of McArthur's Cass Lake, Minnesota, residence. See Transcript of May 30, 2012 Hearing ("Tr.") [Docket No. 640], pp. 59-60. Investigator

Wilhelmy assisted in the drafting of the search warrant application.   Tr.  82.

Investigator Wilhelmy's primary role in the search was to assist other officers to identify

gang paraphernalia and gang documentation.  Tr. 60.  Investigator Wilhelmy stated that

he had numerous previous contacts with McArthur in the prison system given that

Investigator Wilhelmy dealt with Native American issues for eight years as part of his

employment with the MDOC.  Tr. 61-62.

Investigator Wilhelmy testified that officers knocked on the door of McArthur's

residence and McArthur answered the door.  Tr. 61, 84.  Investigator Wilhelmy did not

hear the conversation between McArthur and officers upon entry into the residence.  Id.

Investigator Wilhelmy did not enter the residence until officers had cleared the house.

Tr. 61.  McArthur's girlfriend was also in the residence.  Tr. 63.

After the officers entered the residence, McArthur was placed into handcuffs and

was eventually seated by police on the couch in his living room.   Tr. 62, 84-85.

Investigator Wilhelmy testified that McArthur was moved to the couch in the living room

at the discretion of the officers, his freedom of movement was restricted, he was not

free to leave during the search, and at no time was he told that he was free to leave.  Tr.

85-86.  According to Investigator Wilhelmy, McArthur was cordial and respectful, was

cooperative, and there was no physical altercation between him and any of the officers

executing the search warrant.  Tr. 63, 85-86.

Investigator Wilhelmy testified that McArthur recognized him from a prison

interview and asked him what was going on.  Tr. 63-64.  Investigator Wilhelmy had not

asked McArthur any questions prior to this conversation and McArthur initiated the

conversation. Tr. 64, 87-88. After this initial conversation, Investigator Wilhelmy asked McArthur some questions. Tr. 64, 88. Specifically, Investigator Wilhelmy told McArthur that an investigator at Stillwater prison had told Investigator Wilhelmy that he had heard from an informant that there was an assault or hit out on a Native Mob member by the name of Jeff Dorse, or Rizzo, and asked McArthur he knew why there was a hit out on Rizzo. Tr. 64-65. McArthur's response was that he did not know that there was a hit out on Rizzo and that he did not know why the Native Mob member would have hit on him. Tr. 65. Investigator Wilhelmy then asked McArthur if he knew of any reason why there would be a hit on Rizzo and McArthur responded, "[n]o, I try to stay out of those -- the prison politics when I'm out here." Id. Investigator Wilhelmy acknowledged his questions called for a gang-related answer, although he was more concerned about institutional prison safety, whether that happens to be gang related information that could be pertinent to the Government's case. Tr. 88-89.

No other statement was made McArthur to Investigator Wilhelmy during the execution of the search warrant. Tr. 65.

Investigator Wilhelmy asserted that McArthur did not exhibit any indicia of being under the influence of alcohol or controlled substances during their conversation, McArthur appeared to understand what was going on and he gave appropriate responses to questions put to him. Tr. 65-66.

Mille Lacs Tribal Police Department Officer Michael Dieter also testified about his participation in the February 18, 2011 execution of the search warrant at McArthur's residence. Tr. 159. Officer Dieter's role was to handcuff and detain any individuals that

were encountered inside the home.  Id.  Officers arrived at the residence at approximately 7:55 a.m. and knocked on the door.  Tr. 160.  Once officers went inside the residence, McArthur was ordered to the ground and another agent put him in handcuffs, the house was cleared, and officers had McArthur and his girlfriend sit on the couch.  Tr. 162, 167-68.  Officer Dieter stood by for several minutes near McArthur and his girlfriend while the other agents searched the residence.  Id.  Officer Dieter did not ask McArthur any questions, but he heard McArthur make statements during the execution of the search warrant.  Id.  In particular, Officer Dieter testified that there was a small plastic baggie of marijuana on the coffee table and McArthur stated that it was for recreational use.  Tr. 163.  The marijuana was in plain view in front of everyone.  Tr. 170.  McArthur made the statement approximately a minute or two after being seated on the coach and sometime after an agent had lifted the baggie off the coffee table and set it down.  Tr. 170-72, 175.  Officer Dieter maintained that no officers made any statements regarding the marijuana before McArthur made his statement.  Tr. 171-72.

In addition, Officer Dieter heard McArthur say that "[t]here ain't gonna be no big bust here today."  Tr. 163.  Officer Dieter testified that no officers asked McArthur any questions that would have prompted these statements by him.  Id.  When he made these statements, McArthur appeared calm, there were no signs of alcohol intoxication or controlled substance use and he appeared to understand what was happening.  Tr. 163-64.  No promises or threats were made to McArthur.  Tr. 164.

Officer Dieter testified that he did not hear any Miranda rights being read to McArthur.  Tr. 175.

22

B.  **Analysis**

McArthur argued that other than the first statement he made to Investigator Wilhelmy regarding recognizing him from prison, all the statements he made during the February 18, 2011 execution of the search warrant at his residence should be suppressed. See Wakinyon McArthur's Memorandum of Law in Support of Motion to Suppress Statements [Docket No. 662], pp. 8, 11.  McArthur asserted that the Government conceded that he was in custody at the time he made his statements and that a reasonable person in his position would not feel free to leave, given that he was handcuffed, directed to sit in a specific spot with officers watching him, was not told he was free to leave or that he did not have to answer any questions. Id., pp. 9-10.  Thus, McArthur claimed that he was in custody for Miranda purposes. Id., p. 10.  In addition, McArthur asserted that Investigator Wilhelmy acknowledged that he knew that questioning regarding gangs would likely elicit incriminating responses.  Id., p .11. Finally, McArthur maintained that a reasonable officer would know that lifting a bag of marijuana in front of him would likely elicit an incriminating response.  Id.  Because he was in custody and the actions by officers amounted to an interrogation, Miranda warnings were required and without such warnings, the statements made by him should be suppressed.  Id.

The Government conceded that McArthur was in custody for the purposes for Miranda and that no Miranda warnings were provided to him prior to the statements he made at his residence on the date in question.  See Government's Response to Defendants' Dispositive Pretrial Motions [Docket No. 697] ("Govt. Mem."), p. 3.

However, the Government argued that questions by Investigator Wilhelmy and the lifting of the baggie of marijuana in front of him were not designed to elicit incriminating responses.  Id., p. 4.

As to the questioning by Investigator Wilhelmy, it was the Government's position that the questions by Investigator Wilhelmy regarding the hit on Rizzo were not meant to elicit an incriminating response, but were asked because of Investigator Wilhelmy's concern for the prison security and safety.  Id., p. 5.  According to the Government, intent is relevant to determining whether particular actions constitute interrogation.  Id. The Government also argued that any statements made by McArthur after an officer lifted a bag of marijuana from the table in front of him were spontaneous statements that did not require a Miranda warning.  Id., pp. 5-6.

Under Miranda, an individual must be advised of his or her right to be free from compulsory self-incrimination and the right to the assistance of an attorney any time the individual is taken into custody for questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966); Griffin, 922 F.2d at 1347; see also United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (holding that "[t]he protections afforded by Miranda are only triggered when an individual 'is both in custody and being interrogated.'").

"Interrogation" means "questioning initiated by law enforcement officers." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. The term "interrogation" is defined as "'express questioning or its functional equivalent.' This includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. . . .'" United

States v. Henderson, 770 F.2d 724, 728 (8th Cir.1985) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980)); see also United States v. Cowan, 674 F.3d 947, 958 (8th Cir. 2012) ("A question is an interrogation if it is 'reasonably likely to elicit' incriminating information.") (quoting Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990)); United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) ("Interrogation is not limited to express questioning; it includes words or conduct that the officer should know are 'reasonably likely to elicit an incriminating response from the suspect.") (marks and citation omitted). In Innis, the Supreme Court defined "interrogation" quite broadly to include:

> words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

446 U.S. at 301.   However, "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996) (internal quotations and citations omitted), cert. denied, 520 U.S. 1179 (1997).

The Court concludes that the statements made by McArthur to Investigator Wilhelmy regarding the hit out on a Native Mob member were in response to a custodial interrogation.  As stated previously, the Government has conceded that McArthur was in

custody when he made the statements regarding the hit.  While Investigator Wilhelmy stated that he was more concerned about the hit out on Rizzo and prison safety, and was not necessarily going after incriminating evidence from McArthur, (Tr. 88-89), Investigator Wilhelmy acknowledged that he was involved in an ongoing eight-year investigation of the Native Mob, (Tr. 67), his questioning of McArthur called for a gang-related answer that could be pertinent to the Government's case, (Tr. 88-89), his main role during the search was to help officers identify gang evidence, (Tr. 60), and he had assisted Special Agent Traurig in drafting the affidavit in support of the search warrant of the Maple Street residence that was executed on the day of the questioning at issue.[2] Tr. 82.  The Government is correct that the intent of the police "may [ ] have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."  See Innis, 446 U.S. at 302 n. 7.  However, based on Investigator Wilhelmy's long term and ongoing investigation of the Native Mob and the fact he was intimately involved in obtaining the search warrant for McArthur's residence in order to obtain gang related evidence, he should have known that asking the purported leader of the Native Mob questions regarding a hit out on a Native Mob member were reasonably likely to evoke an incriminating response regarding his gang affiliation, not to mention his possible involvement in ordering the hit.  Thus, the Court finds that the questioning by Investigator Wilhelmy regarding the hit out on a Native Mob member amounted to an interrogation for the purposes of Miranda, and given that there

---

[2]     This affidavit sought, in part, evidence of gang-related activity at McArthur's residence.  Tr. 81-82; Govt. Ex. 12.

were no warnings were provided to McArthur prior to his responsive statements, his responsive statements should be suppressed.

On the other hand, McArthur's statements that the marijuana found on the table in front of him was for recreational use and that "there ain't gonna be no big bust here today," was not in response to any police interrogation. The Court can envision a scenario where an officer's act of bringing a baggie of drugs found in a different room and showing the bag to a detained individual by setting it down in front this person could amount to an interrogation. Here, however, the officers as part of the execution of the search warrant was looking for narcotics, and a bag of possible narcotics happened to be on a table in front of McArthur. There was no evidence presented that an officer brought the baggie up to McArthur's face, picked it up to elicit a comment from McArthur, or made any comments about its discovery. Under McArthur's argument, a suspect whose residence was being searched would have to be blindfolded or removed from the house during the search lest he see an officer discover contraband, thereby compelling him to speak. Merely discovering and examining possible contraband is not the kind of action that police should know is reasonably likely to evoke an incriminating response from a suspect.

Because the evidence in the record supports a finding that McArthur's statements regarding the marijuana and there being "no big bust here today" were merely spontaneous statements, they were not in response to an interrogation for the purposes of Miranda. Therefore, McArthur's motion to suppress as to these statements should be denied.

III.    **DEFENDANT MARTINEZ'S MOTION TO SUPPRESS STATEMENTS**[3]

A.    <u>Factual Background</u>

1.    **November 11, 2011 Statement**

Investigator Terry Lee Nutter with the Minnesota Department of Corrections Fugitive Unit of St. Paul, testified that on November 11, 2011, he assisted in the apprehension of defendant Shaun Martinez at his apartment in Richfield, Minnesota based on a parole violation.  Tr. 115-16.  Investigator Nutter transported Martinez to Hennepin County Jail.  Tr. 116.  Martinez was placed in the rear of an unmarked Chevy Tahoe, which included a cage for transportation.  <u>Id.</u>  The trip from Hennepin County Jail took approximately ten minutes.  <u>Id.</u>  Martinez was handcuffed during the transportation.  Tr. 126.

During the transport, Martinez initiated a conversation with Investigator Nutter.  Tr. 127.  Investigator Nutter testified that he knew Martinez before this interaction based on his work with the Minneapolis Police Department and working on the Little Earth Beat.  Tr. 128.  Investigator Nutter never asked any questions of Martinez and told him that he did not need to talk.  Tr. 117.  Martinez made a number of statements regarding his membership and association with the Native Mob and how he was sick of the gang life.  Tr. 117-18.  Both Martinez and Investigator Nutter were talking during the conversation.  Tr. 127, 131.  Investigator Nutter did not ask Martinez any questions

---

[3]    This Court notes that while Martinez initially moved to suppress a statement given by him to law enforcement on July, 13, 2004 (mistakenly referred to as a July, 13, 2011 statement), his counsel stated at the hearing that he was withdrawing the motion to suppress as to that statement based on the Government's representation that it was not going to be using that statement.  Tr. 33-34.

regarding any criminal conduct committed by him.  Tr. 131.  The conversation with Martinez only lasted approximately five minutes and was completed when Martinez was booked into jail.  Tr. 118.  Martinez was not given his <u>Miranda</u> warnings.  Tr. 127.

Investigator Nutter testified that Martinez did not appear to be under the influence of any kind of drugs or alcohol.  Tr. 119.  Martinez had a calm demeanor.  <u>Id.</u>

## 2.    January 31, 2012 Statements

On the morning of January 31, 2012, Investigators Wilhelmy and Nutter arrived at a Minnesota Correctional Facility in Rush City, Minnesota, where Martinez was incarcerated, to transport Martinez to the St. Paul federal courthouse for an appearance related to the Indictment in the above captioned matter.  Tr.  68.  Before arriving at the courthouse, Investigator Wilhelmy testified that he planned to bring Martinez to Bureau of Criminal Apprehension ("BCA") office in St. Paul to have him speak with Minneapolis homicide detectives regarding the murder of Native Mob member Jeremy Kraskey.  Tr. 68-69, 98.  Investigator Wilhelmy also stated that based on his previous contacts with Martinez, he had a cordial relationship with him.  Tr. 97.

Prior to transporting Martinez, Investigator Nutter attempted to have the conversation tape-recorded during the transportation by taping a recorder under the seat.  Tr. 69-70, 120.  Investigator Wilhelmy testified that they wanted to record the conversation without Martinez knowing.  Tr. 108.

When the officers picked up Martinez, they brought him to the garage where Investigator Nutter read him his <u>Miranda</u> warnings.  Tr. 70.  Martinez was restrained in hand-cuffs and leg irons.  Tr. 100.  The <u>Miranda</u>-related exchange occurred as follows:

Nutter: I guess now because I'm transporting you like this, I gotta read this thing if I can find it.

Nutter: The old Miranda stuff, I guess. You can tell I've never done it.

Wilhelmy: Do you need a card, Terry?

No. I've got my, I got my little book, uh, the constitution requires I inform you have the right to remain silent. Do you understand that?

Martinez: (IA)[4]

Nutter: Anything you say can and will be used against you in court. You understand that?

Martinez: Yeah.

Nutter: you have the right to talk to a lawyer now and have the lawyer present now or at any time during questioning. Do you understand that?

Martinez: Yeah.

Nutter: If you can't afford a lawyer one will be appointed for you without cost. Do you understand that?

Martinez: (IA)

Nutter: You understand each of these rights I have explained to you?

Martinez: Yeah.

Nutter: Do you waive these rights and wish to speak to us?

Martinez: (IA) I'll talk.

Nutter: Okay.

---

[4]  The Court assumes that "IA" means inaudible.

See Government Exs. 1, 2.  Investigator Nutter testified that Martinez indicated that he understood his rights and agreed to give a statement.  Tr. 121.

As to Martinez's previous experience with Miranda warnings, Investigator Wilhelmy testified that Martinez had been given his Miranda rights twice in 1996 (dealing with a stolen vehicle and another unspecified matter), in 1997 (pertaining to possession of a firearm) and in 1998 (dealing with homicide).  Tr. 67.

The entire conversation between Martinez and Investigators Wilhelmy and Nutter was not recorded as Investigators Wilhelmy and Nutter speculated that during the transport, the recorder flipped so that the recording side ended up against the back seat; other than the Miranda warnings, they were not able to hear any clear audio.  Tr. 72. 108.

The drive between Rush City and the BCA office took approximately 45 to 50 minutes.  Tr. 73.  During the drive, Investigator Wilhelmy told Martinez that he was going to be speaking to some people and to keep his mind open, and that some of the things that he would be hearing were going to shock him and upset him.  Tr. 73, 122. Id.  Investigator Wilhelmy did not specifically tell Martinez that he would be speaking to homicide detectives.  Tr. 73.  They told Martinez this information approximately 10-15 minutes before reaching the BCA.  Tr. 103.

Investigator Wilhelmy confirmed for Martinez that he had been indicted federally for racketeering and he was aware why he was going to court.  Tr. 74, 102.

Investigator Wilhelmy testified that Martinez did not appear intoxicated during the interaction and that his demeanor was nervous but that he knew what was going on.  Id.

Investigator Wilhelmy noted that Martinez thought he was going to federal court. Tr. 101. Martinez also appeared to understand what was going on, to be a person of average intelligence, and he answered questions appropriately. Tr. 74-75.

During the transport to the BCA, no promises were made to Martinez, except that Martinez asked for some photographs of his girlfriend and daughter to be transferred with him and Investigator Wilhelmy took those photographs out of Rush City and delivered them to an investigator who in turn gave them to Martinez. Tr. 75-76. Investigator Wilhelmy asserted that this was not a promise that was made in exchange for anything and emphasized that he did not condition his obtaining those photographs for him in any way on him speaking. Tr. 76. In addition, Martinez requested that Investigator Nutter contact his girlfriend, which Investigator Sutter agreed to do. Tr. 76. Again, calling Martinez's girlfriend was not in any way conditioned on Martinez, speaking with them or anyone else. Id. According to Investigator Wilhelmy, the reason why they made these accommodations was that Martinez had been extremely respectful and also to encourage him to talk. Tr. 76-77, 109.

No threats were made to Martinez during the transport. Tr. 76. Martinez did not ask for any food, water, medical assistance, or anything physical during the transport. Tr. 77. Martinez did not ask for an attorney during his transportation. Tr. 77.

Upon arrival at the BCA, the investigators and Martinez went into the parking garage, Martinez was let him out of the truck and he had asked for a cigarette. Id. The investigators got him a cigarette and let him have it while he was in the garage. Id. Officers did not really talk to Martinez during the smoke, except to tell him, "here's a

cigarette," or engage in small talk.  Tr. 106.  Martinez made no incriminating statements in the garage.  Id.  Martinez appeared visibly upset while he was smoking, as he started "tearing up."  Tr. 122-23.  Officers did not give him a cigarette in exchange for anything in return, although it was done to encourage him to talk.  Tr. 78, 119.  When he was done, he was escorted into the BCA and introduced to the homicide investigators, which was approximately 30 feet from where they had parked.  Tr. 77-78.  Investigator Nutter notified the officers that Martinez had been advised of his Miranda rights.  Tr. 123.

Investigator Wilhelmy went and watched the interview in a separate room through a video feed.  Tr. 79.  He watched most of the video, stepping out occasionally.  Id.  During the breaks, Investigator Wilhelmy went to talk to Martinez.  Id.  Investigator Wilhelmy stated that Martinez did not appear to be intoxicated at this time, and no promises or threats were made to him.  Id.  Investigator Nutter noted that Martinez appeared calm at the beginning of the interview, but as the interview continued he became visibly nervous with shaking, fidgeting and visibly crying and sniffling towards the end.  Tr. 125-26.  Martinez did ask for an attorney at the end of the three-and-a-half hour interview.  Tr. 79-80.

Investigator Nutter testified that once Martinez made a reference of an attorney, the interview ended immediately.  Tr. 124.  The transcript of the interview shows that substantive questioning of Martinez ended when he mentioned a lawyer.  See Government Ex. 4, pp. 189-97.  During the interview, Investigator Nutter attempted to make a call to Martinez's girlfriend, upon his request.  Tr. 125.  Investigator testified that

his making the phone calls to Martinez's girlfriend or retrieving certain photographs was not quid pro quo.  Id.

Christopher Gaiters, a sergeant and homicide investigator with the Minneapolis Police Department, testified that he was involved with the investigation of the homicide of Jeremy Kraskey and testified that he participated in the interview of Martinez at the BCA on January 31, 2012.  Tr. 133-34.  Sergeant Gaiters testified that he did not give Martinez his Miranda rights prior to questioning him because he had been told by another officer that they had already been given to him.  Tr. 136-37.  Based on that prior Miranda waiver, Sergeant Gaiters proceeded to ask Martinez questions about the Kraskey homicide.  Tr. 137.  Martinez's demeanor during that interview was somewhat calm, clear, cooperative and very intellectual.  Id.  Martinez did not exhibit any signs of being intoxicated either through alcohol or controlled substances.  Id.  Martinez appeared to understand what the officers were talking about, he was aware of his surroundings, he responded appropriately to questioning, and he exhibited no confusion.  Tr. 138.

The interview lasted approximately three to three-and-a-half hours.  Id.  Sergeant Gaiters testified that he did not threaten Martinez in any way to compel him to talk or promise him anything to get him to keep talking.  Id.  Officers allowed him to use the restroom, drink coffee and have a cigarette.  Tr. 138-39.  Once Martinez made a reference to an attorney, the interview ended immediately.  Tr. 139-40.

B.      **Analysis**

1.      **November 11, 2011 Statement**

Martinez argued that the statements he made to Investigator Nutter on November 11, 2011 should be suppressed as they were result of a custodial interrogation and were made without being advised of his rights under Miranda.  See Defendant Martinez's Memorandum in Support of Motion to Suppress Statements [Docket No. 669] ("Martinez Mem."), p. 5.  According to Martinez, Investigator Nutter interrogated him by engaging in conversation knowing that it would likely elicit a response.  Id.  The Government countered that the conversation was not an interrogation because Investigator Nutter did nothing to provoke an incriminating response from Martinez and did not ask him any questions.  See Govt. Mem., p. 12. The Government maintains that voluntary statements are admissible even if no Miranda warning is given.  Id.

As stated previously, an interrogation for the purposes of Miranda is "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. . . .'"  Henderson, 770 F.2d at 728 (quoting Innis, 446 U.S. at 300-301). However, "'Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'"  Hawkins, 102 F.3d at 975; see also United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation" for Miranda purposes.") (citations omitted); United States v. Hayes, 120

F.3d 739, 744 (8th Cir. 1997) ("'Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'") (quoting United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997)).

In this case, Investigator Nutter testified that Martinez initiated the conversation with him, Investigator Nutter never asked any questions of Martinez (let alone any questions regarding criminal conduct), and eh told Martinez that he did not need to talk. Tr. 117. The Court finds that these voluntary statements by Martinez during the conversation between him and Investigator Nutter were not the product of an interrogation. Therefore, the Court finds that there was no Miranda violation as to the November 11, 2011 statements and the motion to suppress in this regard should be denied.

## 2. January 31, 2012 Statements

Martinez argued that he did not receive a Miranda warning before being interrogated by agents at the BCA office in St. Paul on January 31, 2012, and therefore, the statements he made to officers at the BCA should be suppressed. See Martinez Mem., p. 6. Martinez further claimed that the Government could not rely on the Miranda warning given to him by Investigator Nutter before he started to transport Martinez to what he believed was a court hearing in St. Paul because the time between the Miranda warnings and the circumstances surrounding it make it inapplicable to the BCA interrogation. Id. Specifically, when he was given his Miranda rights, Martinez claims that he had no idea he was going to be taken to the BCA to be interrogated about a

homicide.  Id.  According to Martinez, by the time he had arrived to the BCA about an hour had passed since he was given his Miranda warning and the BCA officers chose not to give him a fresh Miranda warning, likely knowing that that given the new circumstances he would assert his rights.  Id.  Based on these different and deceptive circumstances, Martinez argued that the Miranda warning given to him by Investigator Nutter cannot apply to the BCA interrogation.  Id.

According to the Government, the 45-50 minute lapse between the Miranda warnings and Martinez's statements did not require officers to give him another warning.  See Govt. Mem., p. 13.  Further, the Government maintained that any assertion that the Miranda warning given to him upon leaving Rush City was inapplicable to the BCA interrogation because he was not aware that the officers were taking him the BCA to be interrogated until ten minutes before arrival ignores the fact that silence by law enforcement officials as to the topic of an interrogation is not trickery sufficient to invalidate a suspect's voluntary and knowing waiver of his Miranda rights.  Id., pp. 14-15.

As a starting point, the Court concludes that the approximately 45-50 minute interval between being given his Miranda rights at Rush City to being questioned by BCA officers does not in and of itself invalidate his Miranda waiver for the purposes of the BCA interrogation.  Instead, reviewing courts look to the totality of the circumstances to determine whether re-advisement is necessary.  Wyrick v. Fields, 459 U.S. 42, 47-49 (1982).

With regards to the intervening lapse from the time of advisement of rights to the time of the interrogation, the Eighth Circuit has found as follows:

> This court has found that a one-and-a-half to two-hour delay between Miranda warnings and questioning does not preclude a knowing and voluntary waiver. [ ] We found, in Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985), that a delay of up to six and a half hours between Miranda warnings and interrogation of an intelligent and articulate adult who had significant experience with the criminal justice system did not render the waiver of Miranda rights ineffective. In United States v. Ferrer–Montoya, 483 F.3d 565, 569-70 (8th Cir. 2007), we determined that a one-hour delay between Miranda warnings and questioning did not affect waiver because the defendant was in custody the entire time without asserting his Miranda rights and there was no evidence of coercive conduct on the part of authorities.

United States v. Nguyen, 608 F.3d 368, 374-75 (8th Cir. 2010); see also United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999) (holding that a time interval alone between assertion of Miranda rights and subsequent waiver is not necessarily sufficient to render subsequent statements inadmissible).

Here, Investigator Wilhelmy testified that Martinez had been given his Miranda rights twice in 1996 (dealing with a stolen vehicle and another unspecified matter), in 1997 (pertaining to possession of a firearm) and in 1998 (dealing with homicide).  Tr. 67.  Martinez waived his Miranda rights and agreed to talk to law enforcement in 1996 and 1997 and invoked his right to counsel as to the homicide in 1998.  Tr. 67-68.  Based on Martinez's previous experience with Miranda and the relatively short interval between Martinez being given his Miranda rights and being interrogated by BCA

officers, the Court finds that time between the Miranda rights and his statements did not render his waiver of Miranda rights ineffective for the purposes of the BCA interrogation.

The validity of a Miranda waiver has "'two distinct dimensions'—whether the waiver is voluntary and whether it is knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting Colorado v. Spring, 479 U.S. 564 (1987), quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). In this case, Martinez does not dispute that he made a knowing and voluntary waiver of his Miranda rights when Investigator Nutter conveyed those rights to him. Instead, his focus is on an assertion that because he did not know he was going to be taken to the BCA to be interrogated about a homicide when he waived his Miranda rights, the waiver cannot apply to the BCA interrogation. The Court finds this argument to be without merit. In Colorado v. Spring, 479 U.S. 564 (1987), the Supreme Court dealt with a defendant arrested for an undercover purchase of firearms and after being advised of his Miranda rights, the defendant signed a statement that he understood and waived his rights and was willing to answer questions. Id. at 567. The agents then questioned him about the firearms transactions that led to his arrest and also asked him whether he had ever shot anyone, to which he answered that he had "shot another guy once." Id. The defendant argued that that his waiver of Miranda rights before this statement was invalid because he was not informed that he would be questioned about the murder. Id. at 569.

The Supreme Court concluded that a knowing and intelligent waiver of an individual's Fifth Amendment rights under the Constitution "does not require that a criminal suspect know and understand every possible consequence of a waiver of the

Fifth Amendment privilege." Id. at 574 (citations omitted).   The Supreme Court concluded that the defendant's waiver was knowing, voluntary, and intelligently made despite the agents' failure to disclose the fact that they were investigating a murder prior to the interrogation and upheld the admission of the confession, noting the absence of the traditional indicia of coercion.   Id. at 573-75.   In addition, the Supreme Court found that the agents' failure to disclose the murder did not constitute "trickery" sufficient to invalidate the waiver:

> This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is "trickery" sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline to so hold today.

Id. at 576; see also United States v. Syslo, 303 F.3d 860, 865-66 (8th Cir. 2002) ("An officer may change the topic of interrogation without notice because a 'suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.'") (quoting Spring, 479 U.S. at 577).   The Supreme Court distinguished law enforcement silence with affirmative misrepresentation that could invalidate waiver of a suspect's Miranda rights and reasoned that once Miranda warnings are given, "it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right--'his right to refuse to answer any question which might incriminate him.'" Spring, 479 U.S. at 576 (quoting United States v. Washington, 431 U.S. 181, 188-238 (1977)).

There is no indication that Investigators Wilhelmy or Nutter ever told Martinez what they wanted to talk to him about prior to reading him his <u>Miranda</u> warning.  While he was told that he had been indicted and was being taken to federal court, the officers did not give him a copy of the Indictment or tell him what he had been indicted for.  Tr. 101.  Investigator Wilhelmy acknowledged that there had been some publicity regarding a lockdown related to the Indictment and that Martinez probably figured out that he was one of the individuals subject to the Indictment because he had been placed in segregation.  Tr. 101-02.  Even if Martinez knew about the Indictment related to the Native Mob and his involvement when his <u>Miranda</u> rights were read to him, and he believed he was going to the federal courthouse related to that Indictment, it was not out the realm of possibility that he would be asked questions about the murder involving the Native Mob (<u>see</u> Govt. Ex. 4).  In any event, what Martinez believed the questioning was going to entail and who was going to be doing the questioning, absent some evidence of coercion, is not relevant to determining whether he voluntarily, knowingly and intelligently waived his Fifth Amendment privilege.  Investigators Wilhelmy and Nutter's silence on these issues before Martinez's waiver did not amount to "trickery" and did not preclude him from exercising his Fifth Amendment right to refuse to answer questions that could incriminate him.

For all of these reasons, the Court concludes that the <u>Miranda</u> warning provided to him by Investigator Nutter applied to his interrogation at the BCA and Martinez's motion to suppress the January 31, 2012 statements should be denied.

IV.     SEARCH OF MARTINEZ'S RESIDENCE

Martinez submitted his motion to suppress the July 13, 2011 search of his residence based on a court-issued search warrant, on the basis of the four corners of the warrant and application.  Tr. 33.

Detective Bill Stanger with the Richfield Police Department applied for a search warrant on July 7, 2011 to search a residence located at XXXX Cedar Avenue Apartment #XX in Richfield, Minnesota.  See Govt. Ex. 7.  The warrants were signed by a Hennepin County District Judge and executed on July 14, 2011.  Id., pp. 00000005, 6.  The search warrant for the residence authorized the search for controlled substances (including marijuana); packaging equipment; documents, cell phones, computers, electronic media and video tapes showing drug distribution or contact information related to sources or customers of controlled substances; money to show profit of the sale of controlled substances; firearms; and documents showing the constructive possession of the items seized.  Id., p. 00000005.  In addition, the search warrant authorized the search of clothing or other items that showed gang membership.  Id.

In his affidavit in support of the issuance of the search warrant Detective Stanger provided in relevant part as follows:

> On approximately 05/03/2011, investigators from the Minnesota Department of Corrections notified officers of the Richfield Police Department that a male named SHAUN MICHAEL MARTINEZ * * * had recently moved to XXXX Cedar Avenue South #XX.  Within this conversation, it was shared that Martinez is a ranking member of the Native Mob gang and was on intensive supervised release for a murder conviction.

Since that information was obtained, several Richfield Patrol Officers have received complaints of heavy foot traffic to and from apartment #XX along with the complaint of marijuana odor emitting from XXXX Cedar Avenue South #XX.

Within the past 12 hours, Deputy Hughes of the Violent Offender Task Force (VOTF) met with Airport Detective Killian and her K-9 partner Domino at XXXX Cedar Ave. S. Domino is a member of the United States Police Canine Association (USPCA) and the National Narcotic Detector Dog Association.   Domino is a certified narcotic detector dog.   Hughes asked Detective Killian to have K-9 Domino conduct a sniff for the odor of narcotics of XXXX Cedar Avenue S. #XX in Richfield, Minnesota.   Detective Killian had K-9 Domino sniff several doors in the hallway along with the target door (#XX) in the hallway of the apartment building at XXXX Cedar Avenue S. in Richfield, Minnesota.   K-9 Domino alerted to the odor of narcotics from the door of apartment #XX.

Since this dog sniff was completed, your affiant spoke to Parole Agent Nowac who us currently assigned to Martinez and it was confirmed that Martinez is currently living at XXXX Cedar Avenue South #XX in Richfield, Minnesota.

Id., p. 00000002.   Detective Stanger also provided that based on his experience and training that dealers often store drugs in plastic baggies and that notes are frequently seized that list the prices of drugs with reference of price per unit of measurement.   Id.

During the July 13, 2011 execution of the search warrant, officers seized mailings with Martinez's name and the XXXX Cedar Avenue South #XX Richfield, Minnesota address; a white pill; a plate with cocaine residue; a roll of zig zag papers; miscellaneous writings and gang photographs; a folder with gang notes; a small scale; a notebook with drug notes, a baggie with suspected marijuana; and a black and red Milwaukee Brewers baseball cap.   Id., p. 00000006.

43

The Court finds that the evidence of the K-9's identification of the drugs  within Martinez's apartment (indeed a canine sniff alone constitutes probable cause to search the Apartment for narcotics (see United States v. Carrazco, 91 F.3d 65, 67 (8th Cir. 1996)), coupled with complaints of heavy foot traffic and the odor of marijuana coming from the apartment, and his recent release from prison where he was a high ranking member of the Native Mob gang provided a "fair probability" that evidence of narcotics and gang activity would be found in Martinez's apartment.  As such, Martinez's motion to suppress the evidence seized as the result of the search warrant of his residence should be denied.[5]

## V.    DEFENDANT MORRIS' MOTION TO SUPPRESS EVIDENCE OBTAINED AS THE RESULT OF HIS ARREST

### A.    Factual Background

Victoria Connor, a certified officer with the Leech Lake Tribal Police Department during the events at issue, testified that on March 4, 2010, she was on duty in Cass Lake, Minnesota.  Tr. 184-85.  Connor was patrolling on Cass County Road 75, also known as Palace Drive, in Cass Lake near the corner intersection of County Roads 75 and 60 when she heard information over her police radio that at approximately 3:30 p.m. a shooting had occurred in Tract 34[6] on Broken Arrow Lane.  Tr. 185, 188.  The

---

[5]    This Court finds that even if there had been a constitutional violation, the Leon good faith exception applied.  There is no evidence that any of the circumstances precluding the application of the Leon good faith exception are present in this case. Therefore, even if the warrant was technically defective, the officers' reliance on the warrant was objectively reasonable in light of the totality of the circumstances.

[6]    Tract 34 is a name for an area of public housing containing approximately 40 single-family homes in Cass Lake, Minnesota.  Tr.  187.

report was that an individual had been shot and that a suspect vehicle had fled and a male suspect was running on foot. Tr. 185-86.

After hearing about the shooting, Connor turned her police vehicle around and proceeded to that area down County Road 60 traveling eastbound. Tr. 188. Connor received additional information regarding the description of the individual who had fled the shooting on foot. Id. In particular, the report over the radio was that there was a Native American male fleeing southbound from Tract 34 toward the wooded area on Tract 33 wearing a gray hooded sweatshirt. Tr. 188-89, 203. Connor received no additional physical characteristics of the suspect. Tr. 206-07. The suspect vehicle was reportedly a tan or brown-colored Buick, which she associated with defendant Anthony Cree. Tr. 189, 215-16.

When Connor reached the stop sign at 164th Street and County Road 60, she observed Anthony Cree's vehicle. Id. Connor radioed that she had met that vehicle and was ordered by Deputy Eric Lueth to proceed to Track 33. Id. When she arrived at Track 33, Deputy Lueth instructed her to set up a perimeter between the shooting scene and the wooded area separating it from Track 33, and to wait for a suspect to exit that wooded area. Tr. 189-90. Connor testified that while traveling on 162nd Street, between Tract 33 and the forested area, she saw a male suspect running from the woods down a hill through a clearing. Tr. 190, 191. According to Connor, approximately six minutes passed between the time she heard the call of the shooting and when she saw the male suspect fleeing from the woods. Tr. 190. The distance between the shooting and where the suspect was apprehended was approximately one

city block, a relatively short distance, and was all wooded terrain.  Tr. 190-92.  The weather on the day was a mild and clear spring day with melting snow.  Tr. 193.

Connor saw the suspect male wearing a red jersey and she got out, pulled out her taser and commanded the suspect to stop, drop his phone, get on the ground and put his hands on his head.  Tr. 192-93. The suspect did not try to run or do anything evasive.  Tr. 207.

Connor stated it would it be unusual to see someone jogging through this heavily-wooded area in the snow and that she did not typically see people doing that.  Tr. 193-94.  Conner did acknowledge that there used to be ATV trails in the woods.  Tr. 206.  While the report on the shooting suspect was that he was wearing a grey hooded sweatshirt and the suspect she encountered was wearing a red jersey, Connor testified that based on her experience and training, she believed the suspect had taken the grey hooded sweatshirt off, given that it is not uncommon for suspects to shed their clothing when they are running away from police or the scene of a crime.  Tr. 194.

Based on the fact that Connor saw the male running out on an area of the woods from the direction of the shooting (where Deputy Lueth told her to look for the suspect) approximately six minutes after the shooting, she believed that the suspect had been involved in the shooting and she detained the suspect.  Tr. 194, 219-20.  At the time he was detained, Connor noticed that the suspect's pants and shoes were full of snow, he was breathing heavy, his face was red, he could not speak and could not stand and his body was shaking.  Tr. 195.  Connor detained the suspect in her police truck and after two to three minutes the suspect started having a panic attack and vomiting.  Tr. 195,

46

209.  Connor did not ask the suspect his name or where he was coming from or going.  Tr. 208, 211.  Connor knew at that time, based on the information she received from other officers that a man and his six-year-old daughter had been shot, but did not know if they were dead.  Tr. 198-99, 220.  Connor identified the suspect at the hearing as defendant William Morris.  Tr. 196.  Approximately an hour after Morris' detention in the truck, another police officer tracked the footprints in the snow from Tract 34 to where Morris had been apprehended.  Tr. 197, 209.  Between this time, Connor had received no additional information about the suspect.  Tr. 210.  In addition, during this hour timeframe, Connor took Morris to the hospital, to the scene of the crime and to the police substation.  Tr. 209-10.

### B.  <u>Analysis</u>

Morris argued that any evidence seized as a result of his arrest on March 4, 2010 should be suppressed as the fruits of an illegal arrest.  In particular, Morris argued that his seizure by Connor was not a brief investigative seizure but an illegal arrest without probable cause.  <u>See</u> Morris Memorandum in [ ] Support of Motion to Suppress Evidence ("Morris Mem.") [Docket No. 679], pp. 5-6.  Morris asserted that Connor made no attempt to investigate whether he was the reported shooting suspect and instead held him in her police vehicle for approximately an hour before any progress was made in the investigation.  <u>Id.</u>, p. 5.  According to Morris, the only information Connor had was that he looked Native American and she had found him on foot in the general area.  <u>Id.</u> He claimed that he was under arrest by the time any investigation took place and there was no probable cause that he committed the crime at issue.  <u>Id.</u>  Moreover, Morris

47

argued that Connor had no particularized suspicion that Morris had committed any crime, given that he only matched the race of the purported shooting suspect, his clothing did not match the reported suspect's clothing and he was unarmed. Id., p. 7.

The Government argued that Connor had probable cause to arrest Morris because she found Morris within minutes of the report and only a few blocks from the scene of the crime, he substantially matched the description reported in the dispatch, he came running out of the woods right where Connor, Deputy Lueth and the dispatch reporter suspected he would be, and given the snow in the wooded area, it was highly unlikely that anyone but the suspect would be running through those woods. See Govt. Mem., p. 18. Even if there was no probable cause to arrest defendant, the Government argued that Connor was permitted to stop Morris for further investigation based on reasonable suspicion that he may have committed a crime. Id., pp. 21-22. The fact that Morris was handcuffed and placed in the police truck for an hour was reasonable in order to protect officer safety and did not amount to an unnecessary delay. Id., pp. 22-23. To the extent that the investigatory stop became an arrest, officers had probable cause to arrest Morris given that they found a single set of footprints that led from the scene of the shooting to where Connor found Morris. Id., p. 23.

A warrantless arrest requires probable cause. See United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003). "'To determine the existence of probable cause, we look at the totality of the circumstances as set forth in the information available to the officers at the time of the arrest.'" Id. (quoting United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003)). "We will find that probable cause existed at the time of arrest when the

available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested." Id. (citing same); see also United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (finding that probable cause "'exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested.'") (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)).  Law enforcement officers are not required to have enough evidence to justify a conviction before they make a warrantless arrest. However, a "bare suspicion of criminal activity" is not enough to establish probable cause. Id. (citing United States v. Morales, 923 F.2d 621, 624 (8th Cir. 1991)).  Courts must give law enforcement officers "'substantial latitude in interpreting and drawing inferences from factual circumstances,' but such latitude is not without limits.'" Id. (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999), quoting United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997)).

Further, an investigatory stop is exempt from the Fourth Amendment's requirements that a seizure of a person be made pursuant to a warrant or predicated on probable cause.  See United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003) (citing Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).  "A Terry investigatory stop allows an officer to briefly to detain a citizen if the officer has reasonable suspicion that 'criminal activity may be afoot.'"  Ortiz-Monroy, 332 F.3d at 528 (quoting Terry, 392 U.S. at 30); see also United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003) (citation

omitted) ("[A] law enforcement officer may stop and briefly question an individual if the officer has a reasonable suspicion that the person has committed or is about to commit a crime."). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21; see also United States v. Poiter, 818 F.2d 679, 683 (8th Cir. 1987) ( "to pass Fourth Amendment scrutiny, a Terry-type stop must be based on a reasonable articulable suspicion of criminal activity rather than mere conjecture or hunches. In deciding whether the requisite degree of suspicion exists, we view the agents' observations as a whole. . . ."). In assessing the reasonableness of the action, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry, 392 U.S at 21-22 (citations omitted).

This Court finds that Connor had probable cause to believe that Morris had been involved in the shooting. The evidence in the record shows that Connor received information from fellow law enforcement officers that a Native American male had been involved in a shooting and was fleeing southbound into the woods separating Tracts 33 and 34. Thereafter, Connor and been instructed to set up a perimeter between the shooting scene and the wooded area separating it from Tract 33 and to wait for a suspect to exit that wooded area. Approximately six minutes after the shooting Connor observed a Native American male running southbound out of the woods and down a hill. The area where the suspect had run from was heavily wooded with snow and Conner

testified that it was unusual to see someone jogging through this area. When she made contact with this individual, she noticed that the suspect's pants and his shoes were full of snow, he was breathing heavy to the point where he could not respond to her commands and his face was red. The fact that Connor saw a Native American male running out of a snow covered wooded area shortly after the report of the shooting and the suspect was heading southbound into the woods from the direction of, and a short distance from, the shooting, coupled with the condition of the suspect when she made contact with him, gave her probable cause to believe that he was the suspect involved with the shooting. Although the report on the shooting suspect was that he was wearing a grey hooded sweatshirt and the suspect Connor encountered was wearing a red jersey, this evidence does not affect the finding of probable cause given that Connor testified, based on her experience and training, that it is not uncommon for suspects to shed their clothing when they are running away from police or from the scene of a crime. Based on the totality of the circumstances, this Court finds that probable cause existed for Morris' arrest.

Even if there was not sufficient probable cause to arrest Morris, the Court concludes that Connor had at least reasonable suspicion of criminal activity to warrant an investigative detention. See United States v. Walker, 324 F.3d 1032, 1036 (8th Cir. 2003) ("'The determination of whether a government agent's suspicion is constitutionally reasonable is exceedingly fact specific. We examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be 'understood by those versed in the field of law

enforcement.'") (quoting United States v. Demoss, 279 F.3d 632, 636 (8th Cir. 2002), quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Morris' argument focuses his assertion that an hour-long detention amounted to an arrest.  A detention may become a de facto arrest if it lasts for an unreasonably long time.  See United States v. Sharpe, 470 U.S. 675, 685 (1985).  While there is no bright line between investigative stops and arrests, a de facto arrest can occur when an officer's conduct is more intrusive than necessary for an investigative stop.  See United States v. Bloomfield, 40 F.3d 910, 916-17 (8th Cir. 1994) (en banc) (citations omitted). While the time of detention is an important factor in this determination, "[t]here is 'no rigid time limitation on Terry stops,' a stop may be too long if it involves 'delay unnecessary to the legitimate investigation of the law enforcement officers.'"  Id. at 917 (quoting Sharpe, 470 U.S. at 685, 687).  During a Terry stop, officers may take "such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the stop," and this can include the use of handcuffs and placing a suspect into a police vehicle.  United States v. Martinez, 462 F.3d 903, 907-08 (8th Cir. 2006). There are "'obvious exigencies of the situation'" that authorize an officer the officer to continue a Terry stop by confining the suspect to the patrol car until a situation stabilizes and an officer can determine if full custodial arrest and detention were warranted. Id. at 908 (citing United States v. Lego, 855 F.2d 542. 545 (8th Cir. 1988)).

In this case, the exigencies were that officers, including Connor, had at least reasonable suspicion that Morris was involved with shooting a man and a six-year-old girl and there was a possibility that he could have perpetrated a double homicide.

Given such a serious scenario, it was reasonably necessary to handcuff and keep Morris in her police vehicle for safety and in order to maintain the status quo.  These actions did not serve to convert the Terry stop into an arrest.  Along the same lines, because of the seriousness of the possible crimes, an hour period from his detention to his transfer to the police substation was not excessive to conduct a legitimate investigation as to whether Morris was involved in the possible homicide or serious assaults of two people.  The investigation during that hour period included officers coming through a forested area, which yielded one set of footprints from the scene of the shooting to where Connor came into contact with Morris. Tr. 197.

As the Eighth Circuit has found:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  To hold Agent Danley's actions unconstitutional would require law enforcement officials, at considerable public expense, to maintain specialized personnel and equipment at remote locations at all hours of the day and night, or to forgo the timely investigation of serious offenses as to which they have reasonable, articulable suspicion based on alert and cooperative police work. We do not believe the constitutional prohibition of "unreasonable" seizures dictates such a result.

United States v. Maltais, 403 F.3d 550, 558 (8th Cir. 2005) (marks and citation omitted)

Under Morris' rationale, he should have been released almost immediately.  This goes against the purpose of Terry stop, which is to detain someone to investigate the suspicion of a possible crime.  While Connor herself may not have been engaging in the active investigation, her conduct was in support of those performing the investigation –

that is, she was maintaining the status quo while other officers were investigating Morris' possible involvement.

In sum, given the reasonable suspicion by Connor, the seriousness of the purported crime and the heavily wooded area where the shooting suspect had fled into and where the officers had to investigate, this Court concludes that the detention of Morris was not unreasonably long so as to convert the Terry stop into an arrest.

For all of the reasons stated above, because there was no illegal arrest of Morrison on March 4, 2010, his motion to suppress evidence seized as a result of his arrest on March 4, 2010 should be denied.

## V.    SEARCHES OF MORRIS' RESIDENCE AND SALIVA

Morris argued that the search warrants for his home and saliva lacked sufficient probable cause for their issuance because there is very little evidence contained in the search warrants' supporting affidavits that his home had any connection to the shooting or that Morris had any connection to the grey sweatshirt or glove discovered in the forest between Tracts 33 and 34 so as to warrant a DNA sample to determine whether there was matching DNA on these items.  See Morris Mem., pp. 3, 8-10.  Morris noted that any mention of the footprints found in the snow must be excised from the search warrant affidavits as they were the fruit of Morris' illegal arrest by Connor, as discussed earlier.  Id. at pp. 9-10.  With regards to the search of his residence, Morris asserted that a broad claim that people sometimes keep property in their house was not sufficient to establish a nexus between the place to be searched and items expected to be found. Id. at p. 9.

Investigator Daniel Gardner with the Cass County Sherriff's Department applied for a search warrant on March 5, 2010 to search a residence located at XXXX 162nd Street in Cass Lake, Minnesota and for a search warrant for the taking of a saliva sample from Morris for DNA purposes. See Govt. Exs. 9, 10.  The warrants were signed by a Cass County district judge, and executed on March 5, 2010.  The search warrant for the residence authorized the search for latex gloves, firearms, and documents showing the ownership or possession of the property involved or showing gang affiliation.  A saline sample was obtained from Morris and latex gloves were discovered during the search of the residence.  The affidavits, which are almost identical for both search warrants, both provided that Investigator Gardner had been called in to investigate a shooting involving .40 caliber semi-automatic rounds that had been recovered at the scene.  Investigator Gardner also provided in relevant part:

> Your Affiant and Investigator Stein then interviewed a witness by the name of John Wind who was at the intersection when the shooting took place.   Mr. Wind informed us that he observed two individuals running at the above described location.  As he approached them in his vehicle, he noticed the Victim was holding a child, while the other individual was running after him with a handgun shooting.  He observed the victim and the child fall to the ground.  He then maneuvered his vehicle between the Victim and the suspect.  The suspect stopped shooting and turned around and ran back down Broken Arrow Lane into Tract 34. John Wind then loaded the victim and his daughter into his vehicle and took them to the Cass Lake Hospital.  While on the way to the hospital he called 911.
>
> According to Mr. Wind and other witnesses your Affiant interviewed that observed the shooting, they saw the suspect run east on Broken Arrow Lane (Tract 34) and run South down the driveway of 6065 Broken Arrow Lane into a wooded section north of Tract 33.   Witnesses also stated

that the suspect was wearing a dark grey hooded sweatshirt with the hood up and blue jeans. Just prior to the shooting, he exited the rear passenger side of a vehicle with two (2) other occupants. They also indicated while the suspect was running he had his hands in the sweatshirt pockets.

Your Affiant also learned from LLTP Officer Vicky St. Cyr,[7] who was in the area at the time of the call, that she observed William Morris running south between Tract 33 and Tract 34 and arrested him as he approached the road. The suspect was wearing a red football jersey and blue jeans. The suspect was winded and vomited several times while being arrested. It should be noted that the suspect's residence, 6023 162nd St., was directly on the opposite side of Officer St. Cyr's squad car.

Deputy Bill Connor was contacted to come to the scene as he is a K-9 Officer. K-9 Portos started his track at the point where the suspect was arrested. Deputy Bill Connor followed K-9 Portos directly back to 6065 Broken Arrow Lane and then to the scene of the shooting. While following K-9 Portos on the track, Deputy Connor located a dark grey hooded sweatshirt and a pair of latex gloves. Deputy Connor further noted that K-9 Portos was following a single set of shoe impressions in the snow. These impressions were extremely fresh and no other show impressions were observed.

Your Affiant also learned six (6) empty .40 caliber shell casings were found at the above described location along with apparent blood.

The suspect was subsequently brought to the scene and the tread pattern of the suspect's shoes matched the impressions in the snow that Deputy Connor observed during the track. The suspect was then transported to the Cass Lake Police Department where he refused to provide a statement post-<u>Miranda</u>.

<u>See</u> Govt. Exs. 9, 10.

---

[7]      Officer Vicky St. Cyr is Officer Vicky Connor.

Investigator Gardner's affidavit in support of the search warrant for the residence also provided the following information attempting to connect Morris to the residence:

> On March 5, your Affiant spoke with D.O.C. I.S.R Agent Jason Hermiston and learned that he visited with Mr. Morris on March 4, at about 2:45 p.m. This visit took place with Mr. Morris at his residence, XXXX 162nd St NW. Your Affiant also spoke with Agent Mike Amble and learned that Mr. Morris is a registered gang member (3AK) with the Department of Corrections.

Id., Ex. 9.

With regard to the search warrant for a saliva sample, the supporting affidavit also provided that the affiant was "requesting to obtain a saliva sample from Mr. Morris for DNA purposes so it can be compared to possible DNA evidence that may be found on the latex gloves and dark grey hooded sweatshirt." Id., Ex. 10.

The Court finds that a reasonable person could conclude from the face of the warrant applications and accompanying affidavits that there was a "fair probability" that the evidence of the shooting would be found at the Cass Lake residence and that Morris' DNA would furnish evidence of a crime. See Fladten, 230 F.3d at 1085; see also United States v. Hastings, Crim. No. 11-25 (RHK/FLN), 2011 WL 2412829 at *12 (D. Minn. May, 23, 2011) (finding that the warrant for a sample of his DNA was supported by probable cause as the facts, taken together, established more than a "fair probability" that the defendant's "DNA would match that found on the firearms found in the trunk of his car. There is therefore a "fair probability" that Defendant's DNA would constitute evidence that Defendant committed the crime of being a felon in possession of a firearm."); United States v. Willis, Crim. No. 11-13 (DSD/JJK), 2011 WL 1100127 at

* 3 (D. Minn. March 24, 2011) (finding that a search warrant to obtain a DNA sample was based on probable cause as set forth in the warrant applications and the underlying affidavits given the totality of the circumstances, a reasonable person could believe there is a fair probability that DNA would furnish evidence of a crime).

Both affidavits recount how Morris was detained running out of the woods in the same direction as a shooter was reported fleeing into the woods away from the shooting. Upon his detention, Morris was winded and vomited several times while being arrested. A K-9 tracked at the point where the Morris was arrested and a deputy followed the K-9 directly back to Broken Arrow Lane and then to the scene of the shooting. While following the K-9, Deputy Connor located latex gloves and a dark grey hooded sweatshirt, reportedly worn by the shooting suspect, as reported by witnesses, and also noted that the K-9 was following a single set of shoe impressions in the snow, which were extremely fresh and no other shoe impressions were observed.[8] The tread pattern of Morris' shoes matched the impressions in the snow that Deputy Connor observed during the track.

Given the totality of these facts, coupled with the evidence that as of March 4, Morris lived at the 162nd St NW, the Court finds that there was fair probability that Morris was the suspect shooter. Thus, evidence of the shooting would be found at his residence. As for the saliva sample, the latex gloves and gray sweatshirt (which the suspect was reportedly wearing at the time of the shooting) were found along the only

---

[8]     Any assertion by Morris that evidence of the foot trail in the woods should be excised from the search warrants as the fruit of the illegal arrest of his person is rejected as forth in Section IV of this Report and Recommendation, supra.

trail of footprints found in the woods that connected Morris' path between the scene of the shooting and the scene of the arrest.  Thus, the Court concludes that there was a fair probability and that Morris' DNA would furnish evidence of a crime connecting him to the sweatshirt the shooter was wearing and latex gloves discovered on the trail.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

1.      Wakinyon Wakan McArthur's Motion to Suppress Statements [Docket No. 473] be **GRANTED** in part and **DENIED** in part as follows:

a.      Wakinyon Wakan McArthur's motion to suppress the statements made on February 18, 2011 to Investigator Wilhelmy regarding the hit out on a Native Mob member be **GRANTED**.

b.      Wakinyon Wakan McArthur's motion to suppress his statements made on February 18, 2011, that the marijuana found on the table in front of him was for recreational use and that "There ain't gonna be no big bust here today," be **DENIED**.

c.      Wakinyon Wakan McArthur's motion to suppress his statements made by February 18, 2011 that were overheard by ATF Special Agent Russell Traurig be **DENIED** as moot based on the representations of the Government at the hearing that it would not be using those statements at trial.

2.      Wakinyon Wakan McArthur's Motion to Suppress Evidence Obtained As a Result of Search and Seizure [Docket No. 478] be **DENIED** as follows:

a.      Wakinyon Wakan McArthur's motion to suppress all evidence obtained as a result of the use of global positioning system (GPS) tracking devices placed on his motor vehicles without first obtaining a search warrant is **DENIED** as moot based on the representations of the Government at the hearing it would not be using this evidence at trial;

b.      Wakinyon Wakan McArthur's motion to suppress evidence obtained as a result of the search of the premises located at XXXX Maple St., Cass Lake, Minnesota on February 18, 2011 be **DENIED**; and

c.      Wakinyon Wakan McArthur's Motion to suppress evidence obtained as a result of the search of the premises located at XXXX Grant Utley Ave. NW, Cass Lake, Minnesota be **DENIED**.

3.      Shaun Michael Martinez's Motion for Suppression of Identification Evidence [Docket No. 335] is **WITHDRAWN** based on the representations of Martinez's counsel at the hearing.

4.      Shaun Michael Martinez's Motion to Suppress Statements [Docket No. 336] be **DENIED** as follows:

a.      Shaun Michael Martinez's Motion to suppress jail calls is **WITHDRAWN** based on the representations of Martinez's counsel at the hearing;

b.      Shaun Michael Martinez's Motion to suppress undercover statements is **WITHDRAWN** based on the representations of Martinez's counsel at the hearing;

c.      Shaun Michael Martinez's Motion to suppress his July 13, 2004 statement be **DENIED** as moot based on the representation by the Government that it would not be using the statement at trial; and

d.      Shaun Michael Martinez's Motion to suppress statements made on November 11, 2011 and January 31, 2012 be **DENIED**.

5.      Shaun Michael Martinez's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 337] is **WITHDRAWN** based on the representations of Martinez's counsel at the hearing.

6.      Shaun Michael Martinez's Motion for Suppression of Evidence Obtained by Search and Seizure [Docket No. 338] is **DENIED**.

7.      Christopher Lee Wuori's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence [Docket No. 513] is **WITHDRAWN** based on the representations of Wuori's counsel at the hearing.

8.      Christopher Lee Wuori's Motion to Suppress Statements [Docket No. 514] is **WITHDRAWN** based on the representations of Wuori's counsel at the hearing.

9.      Christopher Lee Wuori's Motion to Suppress Evidence Obtained by Search and Seizure [Docket No. 516] is **WITHDRAWN** based on the representations of Wuori's counsel at the hearing.

10.     Anthony Francis Cree's Motion to Suppress all Electronic Surveillance Evidence and any Evidence Derived Therefrom [Docket No. 413] be **DENIED** as moot based on the representations of the Government that there was no Title III activity.

11.     Anthony Francis Cree's Motion to Suppress any Evidence Obtained as a Result of any Illegal Identification Procedures [Docket No. 415] be **DENIED** as moot based on the representations of the Government that there were no lineups or identifications as it related to Cree.

12.     Anthony Francis Cree's Motion to Suppress any Evidence Obtained a Result of any Illegal Interrogations [Docket No. 416] be **DENIED** as moot based on the representations of the Government that there were no custodial statements taken from Cree.

13.     Anthony Francis Cree's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches or Seizures [Docket No. 417] be **DENIED** as moot based on the representations of the Government that there was no evidence sized with respect

to Cree, except with respect to evidence that was seized from his jail cell for which any motion to suppress is **WITHDRAWN** based on the representations of Cree's counsel at the hearing.

14.     William Earl Morris' Motion to Suppress Any Statements Made by Defendant [Docket No. 455] be **DENIED** as moot based on the representations of the Government that there were no custodial statements taken from Morris that the Government will be using at trial.

15.     William Earl Morris' Motion to Suppress Evidence Obtained as a Result of Any Illegal Searches [Docket No. 456] be **DENIED**.

16.     William Earl Morris' Motion to Suppress Identifications of Defendant [Docket No. 457] be **DENIED** as moot based on the representations of the Government that any lineups or identifications as they related to Morris will not be used against him.

17.     William Earl Morris' Motion to Suppress Wire Interceptions, Electronic Surveillance, and Wiretapping [Docket No. 459] be **DENIED** as moot based on the representations of the Government that there was no Title III activity.


Dated:  August 6, 2012

                                                s/ *Janie S. Mayeron*
                                                JANIE S. MAYERON
                                                United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 27, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within fourteen days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 27, 2012**.